383 So.2d 1 (1980)
STATE of Louisiana
v.
Warren HARRIS, Jr.
No. 64775.
Supreme Court of Louisiana.
March 3, 1980.
*2 Clyde D. Merritt, John M. Lawrence, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise S. Korns, Dennis J. Waldron, Asst. Dist. Attys., for plaintiff-appellee.
CALOGERO, Justice.
Defendant Warren Harris, Jr. was charged by grand jury indictment with four counts of first degree murder in violation of R.S. 14:30. He was tried jointly on all four counts. After jury trial defendant was found not guilty on the first count and guilty as charged on counts two, three and four. The jury after a sentencing hearing recommended that defendant be sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. *3 The trial court sentenced defendant in accordance with the jury's recommendation to three life sentences, the sentences to run consecutively. For reversal of his convictions and sentences, defendant relies upon eighty-six assignments of error grouped into forty-six arguments. Because only four of these arguments raise serious issues, we will here discuss only arguments three, four, nine and twenty-six. The remaining assignments and arguments which involve well-settled principles of law and facts which are of interest only to the parties will be discussed in an appendix, not published with this opinion.
At trial the state adduced the following facts: During an eight week period between February 13 and April 6, 1977 four murders occurred in the French Quarter in New Orleans. Investigation revealed that the victims were robbed and stabbed to death after engaging or attempting to engage in homosexual activities.
When the police learned through a confidential informant on April 12, 1977 of defendant's possible involvement in an unrelated armed robbery and shooting, defendant was taken to the First District Police Station the next day where he made an inculpatory statement implicating himself in the unrelated armed robbery. Defendant was then transferred to the Juvenile Bureau. When it was learned that defendant had been an acquaintance of one of the murder victims, he was questioned as to whether he frequented the French Quarter and associated with homosexuals. Shortly thereafter defendant made oral statements in which he admitted the four murders. Subsequently three written statements were taken in which defendant admitted to killing each of three of the four victims. A written statement as to the fourth killing was not taken because defendant's mother requested that the questioning be discontinued on account of defendant's fatigue.

ARGUMENT III

(Assignments of Error Nos. 3, 14, 15, 16, 17, 18, 19, 22, and 52)
In these related assignments defendant argues that the trial court erred in denying defendant's motion to suppress the confessions. He contends that the confessions were the result of an illegal arrest and that they were not freely and voluntarily made. Additionally defendant contends that the trial court erred in overruling certain of his objections made during the hearing on the motion to suppress. (Only assignments 15 and 18 which relate to the trial court's rulings on objections are argued in brief.)

Voluntariness Issue
In support of his argument that the confessions were not voluntary, defendant contends that the state failed to rebut defendant's allegations that his inculpatory statements were made under duress and that the state therefore did not carry its burden of proving the confessions to be free and voluntary. Furthermore defendant argues that the confessions should have been suppressed because the state failed to adhere to standards announced in State in the Interest of Dino, 359 So.2d 586 (La.1978) concerning confessions of juveniles.
At the hearing on the motion to suppress defendant testified that although he was not struck, kicked or otherwise physically abused, his statements were not voluntary. Harris testified that during the course of the questioning, the officers threatened to "take me off and kill me, throw me in the river. . . . Telling me that if I didn't confess to the murders, . . . they was going to kill me, you know, beat me." When asked whether he signed the waiver of rights forms bearing his signature, Harris stated that he "was forced to sign them."
In brief defendant contends that the state failed to rebut defendant's allegations that he was threatened and coerced into making the inculpatory statements and signing the waiver of rights forms. He contends that the state may not rely upon general testimony that the defendant was not threatened but must specifically rebut the allegations in defendant's testimony.
The record indicates that the state did in fact introduce rebuttal testimony that specifically *4 refuted defendant's claims of threats and coercion. After the defense rested the state presented the testimony of Officer Pascal Saladino, Detectives Thomas Woodall, Frank McNeil, Gerald DeRose, and Officer Michael Dunn. Officer Saladino testified on rebuttal that neither he nor any one else in his presence threatened to kill the defendant and throw his body into the river if he did not co-operate. The officer also stated that no one forced the defendant to sign the waiver of rights forms. The testimony of Detectives Frank McNeil, Gerald DeRose, and Officer Michael Dunn was that no one threatened to kill the defendant and no force was used to make him sign the waiver of rights forms. The testimony of each of these officers specifically refuted defendant's testimony that he was threatened to make the inculpatory statements and coerced into signing the waiver of rights forms.
Defendant in brief also argues that this Court's decision in State in the Interest of Dino, supra, should be applied retroactively in this case. In Dino we held that a confession of a person under seventeen years of age is not admissible unless the juvenile actually consulted with an attorney or an adult before waiving his right to remain silent; that the attorney or adult consulted was interested in the welfare of the juvenile; and that if an adult other than an attorney is consulted, the adult also must be fully advised of the rights of the juvenile. However, this Court in State v. Collum, 365 So.2d 1272 (La.1978) determined that because the rule announced in Dino does not go to the integrity of the fact finding process, the additional safeguards announced in Dino would not apply to cases in which the trial began before the effective date of that decisionJune 15, 1978. Because the confessions in this case were in April of 1977 and the trial begun in October of 1977, Dino is not applicable and under Collum the admissibility of defendant's confessions is to be determined by the "totality of circumstances" surrounding them:
"Proper application of the totality of circumstances test requires that the State sustain the burden of affirmatively proving that the waiver of rights was made freely and voluntarily, with understanding of the consequences which might flow from such a waiver. La.Rev. Stat. 15:451; State v. Hills, 354 So.2d 186 (La.1977). Age of the defendant is a factor which requires this Court to give closer scrutiny to the confession of a juvenile than would ordinarily be required of an adult confession. State v. Sylvester, 298 So.2d 807 (La.1974).
* * * * * *
"There is no litany of factors to be considered in applying the test. Each case is to be judged on all of the facts and circumstances in that particular situation.. . ." 365 So.2d at 1278.
At the time of his confessions defendant was sixteen years old and had completed the seventh grade. Psychiatric evaluations indicated that his I.Q. was estimated to be between 75 and 100 and that he was well-oriented to time, place, person and situation. Two of the reports noted that although defendant was not well-educated, he spoke in a very deliberate manner and had a "surprisingly elegant" spontaneous vocabulary.
Testimony at the hearing on the motion to suppress indicated that defendant's first contact with police officers was at the Top of the Duke Motel after the officers had learned from a confidential informant that one of the persons involved in the robbery and shooting of a seaman was in Room 18 of that motel. Patrolman Fricke testified that he and his partner identified themselves as policemen, told defendant that he was a suspect in the shooting and robbery, and advised the defendant of his Miranda rights. The officer testified that because defendant was a juvenile and it was department policy to have parents present during interviews with juveniles, he requested that defendant accompany them to the First District Station. Defendant voluntarily accompanied them to the station. He was again advised of his constitutional rights and asked whether his mother or father could be contacted. Officers attempted to *5 contact defendant's mother at work but were unsuccessful at this time. Defendant then volunteered the information that he was involved in the robbery but had not shot the French seaman. Defendant was then again advised of his Miranda rights and signed a waiver of rights form. Defendant was then formally arrested for armed robbery and attempted murder of the French seaman and was taken to the Juvenile Bureau.
Approximately 2½ hours after he was initially brought to the police station, defendant was questioned as to whether he frequented the French Quarter and associated with homosexuals. He then volunteered that he was a witness to the stabbing death of one of the four murder victims. Defendant identified the victim's assailant as "Cliff" and picked out a photograph of one Clifton Meeks as the perpetrator of the crime. It was after the officers had failed to locate Meeks and had inquired whether defendant could give any more information about Meeks' whereabouts that the defendant volunteered that he and not Meeks had done the stabbing. Defendant was then again read his rights. The officers continued to question defendant and he then orally confessed to killing each of the four victims. At this time defendant's mother who had finally been contacted arrived at the station. Defendant was again advised of his rights and in the presence of his mother (and his grandfather a part of the time) defendant gave the three written statements (one not fully completed) used at trial.
We can not conclude from this record that the state failed to meet its burden of showing that defendant freely and voluntarily waived his rights with an understanding of the consequences which might flow from such a waiver. According to the testimony presented at the suppression hearing, defendant was advised of his Miranda rights on six different occasions and signed three rights of arrestee forms (two of which were signed in the presence of his mother or grandfather) in which he waived those rights. The officers who questioned defendant testified that he seemed to comprehend each of his rights each time he was advised of them. The psychiatric reports included in the record indicate that defendant is of average or slightly below average intelligence, but that his vocabulary and speech are rather sophisticated for someone of his educational background. And although defendant claims that he was threatened and coerced into giving the statements and signing the waiver of rights forms, the state presented sufficient evidence for the trial court to conclude that the statements were freely and voluntarily made.

Arrest Issue
Defendant next argues that the confessions were inadmissible as the fruit of an illegal arrest made without probable cause. Defendant contends that defendant was unlawfully arrested at the Top of the Duke Motel when the officers questioned him about the armed robbery and shooting of the French seaman.
The testimony as to whether the defendant was "arrested" at the Top of the Duke Motel is conflicting. Officer Fricke testified that when he and Officer Brinke discovered that defendant was a juvenile he requested that he accompany them to the police station so that he could be interviewed in the presence of one or both of his parents in accordance with standard police procedure. Fricke testified that the officers did not draw their guns nor did they handcuff defendant. He was allowed to take his radio with him and played it while he voluntarily accompanied the officers.
Defendant's testimony however was different. He testified in effect that he was arrested at gun point, then taken by the arm and led to the police car. Defendant stated that he did not know whether he was free not to accompany the officers. He contended that had he known that he was not required to go with them, he would not have.
The trial court after hearing this testimony apparently found the officers' testimony more credible than defendant's. Although *6 there is conflicting testimony as to whether the defendant was "arrested," the trial court's apparent conclusion that defendant was not arrested and voluntarily accompanied them is supported by the record. Defendant's argument that the confessions were the fruit of an illegal arrest is therefore without merit.

Other Issues in Argument III
Defendant next makes reference to assignment fifteen which is based on a defense objection at trial during the cross-examination on the predicate relative to the issue of voluntariness of defendant's statement. The defense objected and later moved for a mistrial due to the following question by the state:
"Q. That was when you were arrested?
"A. No. I was arrested when I was taken from the Top of the Duke Motel.
"Q. What were you arrested for there?
"MR. MERRITT:
Objection, Your Honor.
"THE WITNESS:
I have no idea.
"THE COURT:
Wait.
"MR. CAPITELLI:
They opened the door, Your Honor. I objected to that. There was only two questions
"THE COURT:
No, no, don't say any more. I'm sustaining the objection.
"MR. LAWRENCE:
Your Honor, we would like to reserve our right for further objection."
The defendant claims this question constituted reversible error since it had made reference to other crimes. The record reveals that the state's question was not answered in a manner that was prejudicial to the defendant. The trial court sustained the objection, and thereby excluded any prejudicial statements from reaching the jury. The question, in itself, did not indicate to the jury that the defendant had committed another crime within the meaning of La.C.Cr.P. art. 770. In the absence of a showing of prejudice the trial court acted within its discretion in denying the request for the drastic remedy of a mistrial.
Defendant next assigns error (No. 18) to the trial court's ruling which denied the defense request to call defendant's mother to testify on the predicate relative to the admissibility of the confessions. It must be noted that the defense was allowed to call the defendant's mother to the stand during the presentation of the defense case-in-chief. The court's refusal to allow defendant's mother to testify during the predicate on the confession is apparently in conformity with the normal order of trial. La. C.Cr.P. art. 765. The defendant has not established any substantial prejudice from his inability to call the defendant's mother during the predicate on the confession.
Defendant's arguments under these assignments of error are without merit.

ARGUMENT IV

(Assignments Nos. 4 and 5)
By these assignments defendant contends that the trial court erred in denying his motion to sever the trial of the four offenses. He further assigns error to the numerous rulings of the trial court on this motion for a mistrial and severance made during trial.
Prior to trial defendant filed his motion to sever the four counts. It was denied by the trial court, and defendant applied to this Court for review. We granted writs (349 So.2d 875 (La.1977)) and ordered severance and trial on one count or alternatively that the state appear to show cause to the contrary on September 22, 1977. The state appeared on that date and after the matter was argued and submitted, the writ grant of September 19, 1977 was recalled in a per curiam opinion, with two dissents:
"Writ recalled. We can not conclude at this stage that the trial judge erred in determining that severance is not required to assure a fair determination of defendant's guilt or innocence of each offense." 350 So.2d 1164 (La.1977).
*7 To determine whether these offenses were properly joined and whether the denial of the motion to sever was error, we must restate some of the factual details of the crimes. Each of the four murder victims lived alone in the French Quarter of New Orleans, within a seven or eight block area. Defendant met each of the victims on the bus or the street and was invited back to their apartments. Homosexual activity was either performed or attempted prior to each of the murders. All of the victims were stabbed to death, and items of the victims' property were taken during the crimes.
Offenses may be joined under Article 493 of the Code of Criminal Procedure as follows:
"Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial."
Because all four counts of murder are plainly "of the same or similar character," joinder of these offenses did not violate Article 493.
At the time of trial Article 495.1 of the Code of Criminal Procedure provided for the severance of offenses as follows:
"The court, on application of the prosecuting attorney, or on application of the defendant shall grant a severance of offenses whenever:
(a) if before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or
(b) if during the trial upon consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The Court shall consider whether, in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense."[1]
Thus to determine whether severance should be granted, the trial court must decide whether, in view of the number of offenses charged and the complexity of the evidence, the finder of fact can distinguish the evidence and apply the law intelligently to each offense. State v. Coleman, 369 So.2d 1286 (La.1979); State v. Proctor, 354 So.2d 488 (La.1977). When the offenses are joined on the basis of the "same or similar character," the court must also resolve whether each offense would be admissible as similar acts within the contemplation of R.S. 15:445 and 446.[2] Under our holding in State v. Carter, 352 So.2d 607 (La.1977) a determination that multiple counts of the same or similar character may be simultaneously tried requires that the counts be mutually admissible as legitimate "other crimes" evidence under State v. Prieur, 277 So.2d 126 (La.1976).
*8 Because introduction of evidence of other acts of misconduct involves substantial risk of prejudice to a defendant, evidence of crimes related to the offense with which a defendant is charged is inadmissible except under special exceptions. State v. Prieur, supra, The general rule is that the prosecution may not introduce evidence of other crimes unless the evidence is substantially relevant for some purpose other than to show a possibility that defendant committed the crime with which he is charged because he is a man of general criminal character. State v. Sutfield, 354 So.2d 1334 (La.1978). Aside from related offenses admissible as part of the res gestae and convictions admissible for impeachment purposes, Louisiana statutes provide for only three exceptionsacts relevant to show intent, knowledge, or system. R.S. 15:445, 446. Admission of another crime committed by the same "system" as the offense charged might also be relevant to show the identity of the defendant as the offender. See State v. Waddles, 336 So.2d 810 (La.1976).
One of the purposes for which such evidence may be relevant is to show by similar offenses that the act for which the defendant is on trial was not inadvertent, accidental, unintentional, or without guilty knowledge. See McCormick on Evidence § 190 at 450 (Cleary ed. 1972). However for such evidence to be admissible to prove intent, there must be a real and genuine contested issue of intent at trial, State v. Monroe, 364 So.2d 570 (La.1978); State v. Nelson, 357 So.2d 1100 (La.1978), and the probative value of the evidence must outweigh its prejudicial effect. State v. Prieur, supra. For an analysis of the underlying reasons for the exception for proof of intent when genuinely at issue and the prerequisites for its application, see 2 Wigmore on Evidence, § 302 (3 ed. 1940).
The question of whether defendant possessed the requisite criminal intent to murder these victims was a serious issue at trial. Defendant did not take the stand. The defense argued that Harris attempted to defend himself only after he was sexually assaulted by each of his victims. The issue of self-defense was raised; the state had the burden of proving that the killings were not in self-defense. There was, therefore, a real and genuine issue as to defendant's specific intent to kill. The evidence of the four acts which were strikingly similar had great probative value to show that defendant most probably did not act in self-defense in stabbing each of the four victims within an eight week period. While a single instance of a killing in self-defense may rationally and hypothetically be occasioned by an act in self-defense, four similar killings by the same person in an eight week span under peculiarly similar circumstances are not nearly as likely to be in self-defense.
Because these "other crimes" would be admissible under R.S. 15:445 and 446 and Prieur to show that the defendant possessed the requisite criminal intent and would have been admissible in each of the four separate trials if the offenses were severed, we do not find that the trial court's denial of the motion to sever was error. The trial court's determination that the probative value outweighed the prejudicial effect of admission of the other crimes was not, in our view, incorrect. The state's separate presentation of the evidence for the offenses and the jury's finding the defendant guilty of only three of the four murders satisfy us that the number of offenses and the complexity of the facts did not confuse the jury. We therefore conclude that the trial court did not err in refusing to sever the counts. His determination that trial on all four counts was appropriate to promote a fair determination of the defendant's guilt or innocence of each offense, considering the principles enunciated in Carter and Prieur, did not constitute error.
This assignment is without merit.

ARGUMENT NO. IX

(Assignments of Error Nos. 10, 11 and 12)
Defendant assigns error on two separate rulings by the trial court which denied defense requests for a mistrial. Assignment ten arose when Officer Fricke testified on direct examination by the state as follows:
*9 "Q. Was the defendant placed under arrest for anything at that time?
"A. No, sir.
"Q. What happened then, sir?
"A. We went to the motel. We knocked on the door. We observed two subjects in the room, Warren Harris and the other individual I just identified as Jimmy Lee Rogers.
We identified ourselves as police officers. We asked the subject, Warren Harris, his name and he identified himself. It was at this time that we told them that he was a suspect in, again, another unrelated incident."
The defense moved for a mistrial, but the court chose to admonish the jury to disregard the remark by the witness. The defense again requested a mistrial when a police officer testified during cross-examination by defense counsel as follows:
CROSS EXAMINATION BY MR. LAWRENCE:
"Q. Officer Saladino, you stated that you did not give the subject any warning of his rights?
"A. No, sir, because of information that Derose had given me, pertaining to this man had been involved in another incident.
"THE COURT:
No. Hold it right there. Stop right there."
Again the court denied the mistrial and admonished the jury to disregard the remark.
In brief, defendant bases his claim for mistrial on La.C.Cr.P. art. 771(2). The statute provides:
"In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial."
The article leaves the decision as to whether to grant a mistrial or admonition to the sound discretion of the trial court. State v. Hegwood, 345 So.2d 1179 (La.1977); State v. Sepulvado, 342 So.2d 630 (La.1977). However, defendant apparently intends to base his request for a mistrial on La.C.Cr.P. art. 770(2) which provides in pertinent part:
"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible . . ."
This Court has generally recognized that a police officer's unsolicited, unresponsive reference to another crime by the defendant is not the comment of a court official under Article 770. Absent a showing of a pattern of unresponsive answers or improper intent by the police officer or prosecutor such comments would not fall within the purview of Article 770. State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Hammontree, 363 So.2d 1364 (La.1978); State v. Martin, 376 So.2d 300 (La.1979). A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to the defendant sufficient to deprive him of a fair trial. State v. Williams, 375 So.2d 364 (La.1979); State v. Heads, 370 So.2d 564 (La.1979).
*10 In the present case the references indicated that the defendant was a suspect in an "unrelated incident." The police officers apparently used restraint in this testimony as to why the defendant was initially taken into custody. Cf., State v. Foss, 310 So.2d 573 (La.1975). The officers did not specifically mention the other crime involved and the testimony was promptly halted by defense counsel and the court. The trial court did not abuse its discretion in its decision to admonish the jury rather than declare a mistrial. This assignment lacks merit.

ARGUMENT NO. XXVI

(Assignments of Error Nos. 38 and 43)
In assignment thirty-eight defendant argues that the following special charge should have been given:
"Specific intent, which is an essential ingredient or element of the offense with which the defendant at bar is charged, is a particular state of mind, a determination, not merely to perform some criminal act, but to attain some fixed end which end would constitute the corpus delicti of the very offense charged; and specific intent is of larger and more comprehensive scope than general intent.
"`Specific intent' comprehends more than a mere decision to do unlawful act or acts, it is a thought-out design to effect a definite result, a fixed direction of the mind to a particular goal; a contemplation of the particular consequence which would constitute the identical crime charged, combined with an expectation and intention to accomplish that precise effect."
The trial court's charge as to specific intent is detailed and properly informs the jury as to the definition of "specific intent." Because the general charge to the jury adequately covered the applicable law regarding specific intent, the trial court properly refused to give the requested special charge. See, State v. George, 346 So.2d 694 (La.1977).
In Assignment of Error No. 43 defendant argues that the court erred in giving its charge on homicide over objection by defense counsel regarding "specific intent" where there are no external signs of specific intent. In particular at trial the objection was to the language that "specific intent" or premeditation may also be implied where there are no external signs of it beyond the mere fact of the killing itself" and also to the language in the general charge that "a specific intent to kill may be inferred if any deliberately cruel act was committed against one person by another. The intent may be inferred from the circumstances."
"The basis of these objections was that this was not "the law of first degree murder."
We find the charges unobjectionable. The state's burden of proving the element of specific intent is not undermined by the charge. There was nothing illogical or lined in other portions of the trial judge's charge. There was nothing illogical nor mandatory insofar as the instruction to the jury about these permissive implications and/or inferences.
In brief for the first time defendant objects to that portion of the trial judge's general charge which informs the jury that "the law holds that a sane person is presumed to intend the natural and probable consequences of his acts." He relies primarily upon Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).[3]
*11 In the present case unlike Sandstrom defense counsel made no objection to the trial court's charge that "the law holds that a sane person is presumed to intend the natural and probable consequence of his acts." Therefore, because no contemporary objection was made this charge cannot be urged as error on this appeal. See La.C.Cr.P. art. 841; State v. Kelly, 362 So.2d 1071 (La. 1978); State v. Williams, 366 So.2d 1365 (1978). Furthermore the judge's charge to the jury in the present case made it very clear that the state had the burden of proving beyond a reasonable doubt specific intent to kill.

Decree
For the foregoing reasons, the convictions and sentences of defendant are affirmed.
AFFIRMED.
DIXON and DENNIS, JJ., concur.
NOTES
[1] Article 495.1 was amended by Acts 1978, No. 466 § 1 effective after the date of defendant's trial to provide as follows:

"If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses or provide whatever other relief justice requires."
[2] R.S. 15:445 and 446 provide as follows:

"In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction." R.S. 15:445
"When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent and where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged." R.S. 15:446
[3] In Sandstrom v. Montana the accused confessed to the slaying of Annie Jessen and was charged with deliberate homicide under Montana law, in that he "purposely or knowingly caused the death of Annie Jessen." At trial Sandstrom admitted killing Jessen, but defended on the ground that he did not do so "purposely or knowingly," and was hence not guilty of "deliberate homicide," but of a lesser crime, relying for his defense on testimony of mental health experts. The trial judge instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts" unless he offers evidence to the contrary, whereupon Sandstrom's attorney objected, arguing that this instruction had the effect of shifting the burden of proof on the issue of purpose or knowledge to the defense. Ultimately the Supreme Court of the United States reversed Sandstrom's conviction for deliberate homicide, pointing out that a reasonable juror could have inferred that this presumption was mandatory and irrebuttable, that the lone element of the offense at issue in Sandstrom's trial was whether the crime was committed purposely or knowingly, and that the instruction was constitutional error because it relieved the prosecution of the burden of proving every essential element of the crime beyond a reasonable doubt.